## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Sezzle, Inc., | | Case No. _____ |
| | Plaintiff, | |
| v. | | **Jury Trial Demanded** |
| Shopify Inc., | | |
| | Defendant. | |

## Complaint

Plaintiff Sezzle brings this antitrust case for damages and permanent injunctive relief against Defendant Shopify for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Minnesota law. Sezzle seeks to end Shopify's monopolistic and anticompetitive business practices and restore competition and consumer choice in the increasingly popular markets for "drag-and-drop" e-commerce platforms and online "buy-now, pay-later" payment services, and to recover potentially hundreds of millions of dollars of lost profits.

### Introduction

1.     This case is about stopping Shopify, a Canadian website giant operating America's largest e-commerce platform, from charging businesses unfair fees and manipulating consumers to force them to use Shopify's online payment services instead of competing services. Shopify's anticompetitive conduct caused all of those people harm and Sezzle to lose significant profits.

2.     Defendant Shopify carried out its anticompetitive conduct after

Sezzle was able to successfully launch and significantly grow its "buy now, pay later" ("BNPL") service on Shopify's drag-and-drop e-commerce platform. BNPL services are payment services that can be integrated into e-commerce stores, like those on the Shopify platform, allowing consumers to get instant credit at the point of sale to buy products on credit and repay them later, interest-free.

3.      Shopify dominates the market for drag-and-drop e-commerce platforms, offering small to medium-sized businesses (called "merchants") a comprehensive solution to build and maintain online storefronts and sell products to consumers online. Shopify touches every aspect of those online stores, from developing the websites to tracking sales and shipping products, so consumers can purchase products on merchants' websites. Shopify can do this because it gives merchants the ability to create websites effortlessly, by using templates to create websites that look custom-made. Shopify makes it nearly impossible for these merchants to switch away from its platform by preventing them from using their websites beyond the walls of Shopify's platform.

4.      Additionally, as part of this, Shopify has its own accelerated payment checkout system implemented on merchants' websites called "Shop Pay." Shopify uses tactics to get as many merchants and consumers as possible to use that product so it can perpetually capture consumers and take a cut of any credit card transaction fees from their purchases, resulting in billions of dollars in

revenue for Shopify. All this has contributed to Shopify capturing millions of merchants and their customers on its platform, enjoying a market capitalization of over $140 billion dollars, and becoming the largest e-commerce platform in the United States.

5.      Sezzle is a Minnesota-based company. When Sezzle launched, it was the first product that allowed U.S. consumers to buy products on a merchant's website and pay for them in four interest free installments. This was hugely beneficial to both consumers and merchants on the Shopify platform because it gave consumers more buying options and, in turn, greatly increased merchant sales. So not surprisingly, Sezzle became instantly valuable to consumers and merchants alike and had massive growth on Shopify's platform.

6.      But after watching Sezzle's instant success with its merchants, Shopify intentionally abused its market power in Drag-and-Drop E-Commerce Platforms to capture the BNPL market on the Shopify platform by copying Sezzle with its own BNPL service, called Shop Pay Installments, and preventing merchants and consumers from using any other BNPL providers, like Sezzle. Shopify executed its plan by using its stranglehold on the market.

7.      Shopify did this in several ways. To begin, Shopify used its market power to set Shop Pay Installments as the default BNPL provider on merchants' websites. So any new merchant or any merchant who didn't specify otherwise,

had Shop Pay Installments automatically installed as the BNPL product offering on its website ahead of every other BNPL offering.

8.    Shopify also rigged the checkout process on merchants' websites to make it extraordinarily difficult for consumers to use any alternative BNPL providers, like Sezzle. Shopify hid Sezzle and other BNPL providers, as a checkout option on merchants' websites so consumers couldn't easily find them. Even after consumers managed to locate and select Sezzle's BNPL option on a Shopify store's website, Shopify redirected them to a generic form, leading consumers to mistakenly believe the form was associated with Sezzle. Shopify's manipulation allows it to intercept consumers by capturing their information and then perpetually offering that consumer Shopify's Shop Pay payment processing service every time the consumer tries to buy something (by directing the consumer to ultimately pay through Shop Pay instead of using Sezzle). This has resulted in would-be Sezzle users becoming incredibly confused and frustrated, and eventually using Shop Pay Installments instead of Sezzle to make purchases, which allows Shopify to process all of those sales that would have gone to Sezzle.

9.    Additionally, Shopify imposed technological barriers that decreased the functionality and consumer appeal of Sezzle's service. For example, Shopify took away Sezzle's ability to offer merchants real-time inventory locking, which

4

was a valuable tool that helped merchants prevent oversales and resulting order cancellations and delays. Shopify then made it so only Shopify (and nobody else) could offer that beneficial feature to merchants.

10.    Shopify also took away competing BNPL providers' ability to use a basic Order ID function with merchants that allows merchants to track their sales and perform basic reconciliation functions. This was competitively significant because, without the Order ID, merchants couldn't effectively reconcile transactions, resulting in decreased efficiency, inventory-management difficulties, and likely, lost sales. And when merchants can't perform basic reconciliations for sales made using Sezzle or other BNPL providers, they often stop using those platforms.

11.    Finally, after years of allowing merchants to use Sezzle and other BNPL providers on their websites for no charge, Shopify used its power to force millions of merchants to enter into anticompetitive contracts, which penalized them (by charging them) for using Sezzle or another non-Shopify BNPL provider. This penalty only served to further compel merchants to use Shop Pay Installments instead of Sezzle or others.

12.    Shopify's actions had no legitimate business purpose, and Shopify actively used the anticompetitive barriers it built around its Shop Pay Installments product as a differentiator and selling point with merchants and

consumers.

13.    The inevitable outcome is that Shopify's anticompetitive conduct has drastically reduced competition in the market for BNPL Services on Shopify's platform and harmed both merchants and consumers by:

- preventing them from using payment products they want to use while also manipulating them to use a payment product they don't want to use or wouldn't use;

- forcing them to pay more for using payment products they want to use; and

- reducing consumers' overall buying power in Shopify-based stores by not being able to use other payment services that are better for them.

14.    Shopify's intentionally anticompetitive efforts have caused harm to consumers and merchants, and that harm has flowed down to Sezzle. Indeed, by 2023, Shopify's BNPL product hadn't just grown; it had surged to become the titan of BNPL providers on the Shopify platform, simultaneously cutting Sezzle's business with merchants on the Shopify platform in half. By 2024, Shopify's estimated BNPL market share with its merchants exceeded 75%. Shopify's ongoing misconduct has therefore systematically eroded Sezzle's business with Shopify merchants, allowed Shopify to dominate the BNPL market, and reduced (or eliminated) the BNPL choices and quality available to merchants and consumers alike. Shopify's misconduct should be stopped. And Shopify should be held accountable.

## The Parties

15.    Plaintiff, Sezzle, Inc. is a Delaware public benefit corporation with its principal place of business in Minneapolis, Minnesota. Sezzle's mission is to "financially empower the next generation," by offering an alternative payment platform for consumers to buy products online through a merchant's website and pay with BNPL installment plans.

16.    Defendant, Shopify Inc. is a corporation organized under the laws of Canada, with its principal place of business in Ottawa, Ontario, Canada. Shopify started out as a website company and operates the largest e-commerce platform in the United States, hosting online stores for millions of merchants and earning over $8 billion in annual revenues.

## Jurisdiction and Venue

17.    Sezzle brings this case under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-66, and the Minnesota Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-48, to recover treble damages, costs, injunctive relief, and attorney's fees for injuries sustained by Sezzle because of Shopify's violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, Sections 325D.51 and 325D.52 of the Minnesota Antitrust Law, Minn. Stat. §§ 325D.51, 325D.52, and Section 325D.44, Subdivision 1(13) of the Minnesota Deceptive Trade Practices Act,

Minn. Stat. 325D.44, Subd. 1(13).

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1337, 1367(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

19.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Sezzle and Shopify, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

20.     This Court has personal jurisdiction over Shopify because, among other things, Shopify (i) transacted business throughout the United States, including in Minnesota, (ii) provides its e-commerce platforms throughout the United States, including for thousands of online stores located in Minnesota, (iii) advises its customers on how to start a business in Minnesota,[1] (iv) sent personnel to Minnesota to investigate Sezzle's business for anticompetitive purposes, and (v) engaged in anticompetitive conduct that was directed at, and had the intended effect of, causing injury to Sezzle in Minnesota, as well as merchants and consumers residing in, located in, or doing business in Minnesota. In addition, this Court separately has personal jurisdiction under

---

[1] *See* https://www.shopify.com/blog/how-to-start-a-business-in-minnesota; https://www.shopify.com/blog/how-to-start-an-llc-in-minnesota.

Minn. Stat. § 543.19 because Shopify engaged in wrongful conduct causing injury to Sezzle in Minnesota.

## Factual Allegations

**I.    Sezzle pioneered "By Now, Pay Later in 4 installments" payment services in the United States.**

21.    Sezzle was founded in 2016 to empower consumers by offering interest-free options for financing purchases primarily at online merchants without undergoing lengthy credit checks, paying large amounts of interest, or damaging their own creditworthiness.

22.    In the wake of the Great Recession, Sezzle was designed as a solution to give younger consumers, and others with no or low credit scores, access to credit that they wouldn't otherwise have. Sezzle's goal is to help consumers manage spending responsibly, build financial knowledge, and achieve financial independence, all while connecting them with access to a global network of merchants. Sezzle's model also greatly benefits merchants by amplifying consumers' purchasing power and increasing sales.

23.    Sezzle was the first company to offer BNPL Services to online merchants and consumers in the United States. Other companies soon followed with competing BNPL products in the United States, including Klarna, QuadPay, Afterpay, and PayPal.

24.    After creating a Sezzle account—which a consumer can easily do in a

couple minutes online—a consumer can purchase goods and services at any merchant that accepts Sezzle. Consumers who do this get a payment plan from Sezzle, which typically divides the purchase amount into four equal payments that the consumer pays over six weeks. Sezzle's service is sometimes called "Buy Now Pay Later," or "Pay in Four," or "BNPL."

25.     Unlike financing through credit cards, the consumer generally pays no interest on purchases made with Sezzle. And because Sezzle underwrites each transaction on the consumer's account, the consumer isn't able to accumulate significant debt with Sezzle. Additionally, if a consumer doesn't meet their repayment obligations, Sezzle stops that consumer's ability to make more purchases until they become current on their payments, and then lets them purchase again.

26.     For those consumers who wish to build their credit histories, Sezzle even offers a unique service called "Sezzle Up" that enables consumers who choose to enroll to have their payments reported to credit bureaus. This can be a great benefit to consumers. In fact, in many instances, consumers who made on-time payments while enrolled in Sezzle Up have seen credit scores increase within the first four months of reporting, and as of June 2025, Sezzle Up has been used to report over 20 million transactions to credit bureaus.

27.     Merchants can sign up to accept Sezzle payments by completing a

simple online process. In exchange for accepting Sezzle, merchants agree to pay Sezzle a small per-transaction fee, plus a percentage of the transaction amounts processed on Sezzle.

28.    While this percentage is higher than what is charged by credit card issuers, merchants who accept Sezzle find that it lowers barriers (cash and credit availability) that prevent some customers from buying. In particular, the additional sales revenue that Sezzle generates by expanding the base of potential purchasers more than compensates for those fees. Moreover, Sezzle assumes the credit, fraud, and chargeback risks for these merchants.

29.    Sezzle also created and enabled real-time inventory locking for Shopify merchants. This feature prevented merchants from "overselling"—making sales for products that are not in inventory—by locking an item out of the merchants' inventory once its placed in a customer's shopping cart.

30.    Sezzle's inventory locking was a desired feature for Shopify merchants and their consumers. That's because overselling results in sales cancellations or delays, which the consumer typically holds against the merchant, potentially causing that merchant to lose a customer for life.

31.    Sezzle's BNPL Service is generally free to consumers making purchases from Shopify-based merchants, as there are no interest charges and no

fees for consumers who make payments on-time from their bank accounts or debit cards.

32.    Like consumers, merchants can easily set up Sezzle in minutes. Merchants simply download Sezzle and add it to their checkout. And then, because of Sezzle's customer-friendly design, Sezzle is automatically added as a payment option, along with major credit and debit cards and whichever other forms of payment the merchant would like to offer.

33.    After a consumer's transaction is completed, Sezzle deposits the total purchase amount, less Sezzle's fee, into the corresponding merchant's account.

34.    Sezzle's online-purchase process is also seamless from the consumer's perspective. When a consumer selects Sezzle as their payment method for a purchase, they simply log into their Sezzle account, where they can see how much is due at the time of purchase and in subsequent installments, and click "complete purchase."

35.    Consumers pay for Sezzle purchases on the required installment dates by linking their repayment source to their Sezzle account, from which their funds are withdrawn automatically or manually, at the consumer's option. Sezzle also gives consumers some flexibility to move installment dates to meet their needs.

36.     After a consumer sets up a Sezzle account, they can shop at Sezzle-enabled merchants' websites and through Sezzle.com or the Sezzle app, where they can apply rewards earned on purchases made through Sezzle and/or may receive special offers at participating Sezzle-enabled merchants.

37.     Because of Sezzle's features and ease of use, Sezzle experienced huge growth in the years after it launched and as BNPL caught on with merchants and consumers. And that growth was expected only to continue as time went on.

## II.    The e-commerce platform industry revolutionized how businesses and consumers interact online.

38.     Sezzle's growth and success in the BNPL industry dovetailed with the emergence of e-commerce platforms.

39.     In the early days of the internet, an aspiring online merchant needed to design its website manually—a process that was expensive, time-consuming, and required technical knowhow. Next came online marketplaces like Amazon and Ebay, which aggregate products from a variety of sellers on a single website, providing sellers access to the online marketplace's customer base in exchange for a commission, but don't allow the sellers to control their own branding or customer relationships.

40.     After that, services known as e-commerce platforms emerged to assist merchants in designing, building, and maintaining their own online stores.

E-Commerce platforms utilize software for building and running an online store, while performing other retail functions such as marketing, inventory management, and payment processing.

41.    Usually for a fee or subscription, e-commerce platforms provide merchants with online templates with which they can design websites that allow the merchant to maintain its own branding and "look and feel" as if it had designed and programmed its own site from scratch.

42.    Shopify is a full-service e-commerce platform that facilitates the creation and management of online stores. Like other e-commerce platforms, Shopify's subscription-based service allows merchants to set up an online store and market their products directly to consumers.

43.    Shopify and other e-commerce platforms developed an online retail channel that was entirely distinct from digital marketplaces like Amazon, because they allow the merchants to operate their own direct-to-consumer online stores and allow the merchants to maintain control of their own branding and customer relationships. In contrast, merchants on Amazon's site receive access to Amazon's customer base, but must pay commissions to Amazon as high as 50% of their sales, don't have the opportunity to customize the look of their website, aren't given access to all of the customer analytics available through e-commerce platforms, and don't have the same ability to market directly to their customers

14

with promotions and new releases.

44.    Founded in 2006, Shopify became the leading solution for small to medium-sized businesses looking to sell products online without extensive technical investment. That's because Shopify developed an all-in-one, easy-to-use "drag and drop" interface that enabled merchants to build their websites and online stores without the need for any technical expertise.

45.    As the name suggests, "Drag-and-Drop E-Commerce Platforms" allow small to medium-sized merchants—usually not technically advanced and having relatively little capital to invest in website building—to create their websites by using predesigned templates and taking images from their computers, "dragging" them into website templates and "dropping" them where they want them placed. As such, Drag-and-Drop E-Commerce Platforms enable any merchant with basic computer skills to relatively quickly and effectively create an online platform to sell its goods or services.

46.    E-commerce platforms also enable merchants to integrate certain proprietary and third-party services into their websites. For example, a clothing store might integrate a service that helps its customers choose the correct size, or a pet food seller might add a subscription service that facilitates regular shipments of dog food. Or, as relevant to this case, a merchant might incorporate a service that expands consumers' options for payment, such as Sezzle, Afterpay,

or Klarna.

### III.    For years, Sezzle's and Shopify's services complemented each other, and each profitably contributed to the explosion in e-commerce.

47.    Sezzle's user-friendliness and consumer-centric business model has earned it one of the highest favorability ratings among consumers in the BNPL market.

48.    Merchants have also had extremely positive results from offering Sezzle as a payment method. In fact, merchants that utilize Sezzle have reported, on average, a 20% uplift in average order value, 10% increase in purchase frequency, and a 50% decrease in returns—all metrics that deliver immediate results to merchants' bottom lines. And merchants that choose to be listed on Sezzle's website also report seeing up to a 10% increase in revenue.

49.    So it's not surprising that Sezzle's merchant and consumer satisfaction led to a rapid adoption of Sezzle's service, which contributed to Sezzle's significant success and growth in revenue.

50.    Sezzle's growth with and adoption by Shopify stores was particularly strong. For example, from January 1, 2019 through June 1, 2021, the total value of Sezzle transactions on Shopify stores increased over 1200%, and the number of Shopify stores using Sezzle tripled. Sezzle was poised for even greater growth rates with Shopify stores as the BNPL market itself continued to grow.

**IV.    Shopify became the dominant Drag-and-Drop E-Commerce Platform.**

51.    In the years since its founding in 2006, Shopify has grown to become the largest e-commerce platform in the United States and the dominant provider of Drag-and-Drop E-Commerce Platforms for merchants.

52.    Indeed, Shopify hosts approximately 4.4 million active merchant websites worldwide. And this figure dwarfs the next-largest providers of Drag-and-Drop E-Commerce Platforms, Wix (approximately 700,000 active websites), Squarespace (200,000), and Square (300,000).

53.    It's even likely that the number of active websites significantly underestimates Shopify's market power because Shopify-based merchants generally do more business than those on rival Drag-and-Drop E-Commerce Platforms, such that Shopify merchants generate far greater revenues per merchant, especially through the payment platforms that are central to this case.

54.    Additionally, once a merchant creates and publishes its website on Shopify, several factors make it extremely difficult and impractical for the merchant to switch to another provider. There are multiple reasons for this.

    a.    Shopify doesn't allow its merchants to simply take their websites with them to use on another platform. Nor does Shopify let merchants download the website's design files or narrative content and instead limits them to taking a single comma-separated values ("CSV")

file. So that effectively requires the merchants to start over creating the
design and descriptive work they used to build their Shopify store. And
merchants that aren't familiar with how CSV files work (which most
merchants likely aren't), are left without any of the information they used
to run their Shopify-based websites.

b.    Additionally, transferring the merchant's website domain
from Shopify to a new platform involves a multi-step process that is
technically prohibitive to many merchants.

c.    Also, transferring the merchant's domain to a new platform
results in significant delays that can impact the merchant's business. The
transfer itself can take up to seven days, and depending on the protocol
used by the new platform, the merchant's website could experience errors
for up to 90 days after transfer, which could be devastating to the
merchant.

d.    Finally, Shopify provides its merchants with access to, and
integration with, many different easy-to-use apps that merchants rely on to
operate many different aspects of their businesses. And without the same
level of access to these apps (that they've come to rely on), merchants find
it difficult to operate their businesses effectively.

55.    And if any of these steps don't go smoothly, merchants could see

their online shops go "down," might lose customer data, and their prioritization on search engines like Google might suffer. This migration process is often too time-consuming for the average small to medium-sized merchant that makes up the majority of Shopify users.

## V.    Shopify also developed and cemented its own payments processing business.

56.    In 2013, Shopify launched a payments processing business called "Shopify Payments," which has become Shopify's largest source of revenues and profits.

57.    Shopify Payments enables Shopify-based merchants to process credit-card transactions directly on their websites. Shopify sets Shopify Payments as the default payment processor when merchants enroll with Shopify, and Shopify Payments has incredibly high adoption rates (about 88% to 90% or more) by Shopify merchants in the United States.[2]

58.    Shopify earns a percentage of *every* transaction processed through Shopify Payments. For example, if a customer's $100 credit-card purchase is processed through Shopify Payments, Shopify charges the merchant a percentage of that $100 (often around 2.9% + $.30), and would therefore collect approximately $3.20 from that $100 charge. And that's likely why Shopify

---

[2] *See* Shopify Annual Reports 2021-2024.

Payments accounted for most of the $6.5 billion in revenue for Shopify's "merchant solutions" business in 2024.[3]

59.    In addition to its payment processing business (Shopify Payments), Shopify offers a related "accelerated checkout" product called "Shop Pay." Shop Pay accelerates the checkout process by saving and automatically entering consumers' purchase-related information (name, email, address, phone number and credit card number) when they go to purchase products on Shopify-based merchants' websites. For example, when a consumer goes to check out on a merchant website using the Shopify platform, the consumer can select Shop Pay as their payment option, and Shop Pay automatically provides the consumer's payment and shipping information to the merchant and completes the consumer's purchase using that information. Purchases made through Shop Pay are processed through the Shopify Payments system. Shop Pay does this automatically for the consumer's future purchases with all Shopify merchants that use Shop Pay, which allows Shopify to ensure that all of that consumer's future purchases are also processed using Shopify Payments.

60.    Shopify offers Shop Pay for free to merchants that subscribe to the Shopify platform and enable Shopify Payments to process their credit card

---

[3] *See* Shopify's 2024 Annual Report at 53.

transactions.[4] And Shop Pay is automatically installed for merchants that use Shopify Payments.[5]

61.    So, while Shopify markets Shop Pay as a way for merchants to increase their conversion rates,[6] Shopify's real motivation in offering Shop Pay, and automatically pairing it with Shopify Payments, is to guarantee that it benefits from every consumer transaction and keeps getting the billions of dollars in fees it takes in through Shopify Payments.

## VI.    Shopify intentionally copied Sezzle's innovative BNPL product and business model.

62.    Originally, Sezzle and Shopify had the quintessential symbiotic relationship—each contributing to the demand for the other's services. In a truly competitive market, Sezzle's and Shopify's services would be complementary because Sezzle's BNPL product greatly benefits the same small to medium-sized merchants that Shopify's Drag-and-Drop E-Commerce Platform serves. Sezzle even referred merchants to Shopify in the early years to help Shopify grow.

63.    That's how a fair marketplace works, and that's how it was when Sezzle launched in 2017, when merchants first had the ability to select and install Sezzle on their Shopify-based websites. Merchants installed Sezzle to grow their

---

[4] *See* https://www.shopify.com/shop-pay ("Get it free with Shopify Payments").

[5] *See id.* ("Any merchant using Shopify Payments gets Shop Pay automatically").

[6] *See id.* ("As much as 50% better conversion compared to guest checkout").

sales, which made Shopify even more attractive to merchants. Similarly, Sezzle's availability on Shopify helped distribute Sezzle's product and contributed to Sezzle's rapid growth among Shopify-based merchants. On information and belief, by 2019 or 2020, Sezzle was the fastest growing BNPL payment option for merchants on the Shopify platform.

64.    Shopify then soon recognized that Sezzle would continue to generate huge revenue outside of Shopify Payments with a product that Shopify didn't currently offer. And Shopify didn't want that to continue.

65.    So in 2018, only a year after Sezzle launched on Shopify, Shopify sent two senior executives to visit Sezzle's headquarters in Minneapolis to learn as much as they could about Sezzle's successful business. Shopify did this under the guise of "corporate development," and falsely suggested to Sezzle that Shopify was interested in acquiring or joint-venturing with Sezzle. But on information and belief, Shopify's only purpose was to get as much knowledge about Sezzle's business as it could so that Shopify could copy it.

66.    In fact, soon after meeting with Sezzle, Shopify started speaking with potential technology partners to help Shopify launch its own BNPL service. And even though Sezzle was one of the leading BNPL services on Shopify (and had an established track record of success on Shopify's platform), Shopify didn't even contact Sezzle.

22

67.     Shopify knew merchants wanted BNPL products like Sezzle's because they increased conversion rates and order amounts. And Shopify knew how much consumers wanted the interest-free, flexible payments that they got with BNPL products like Sezzle. So in May 2020, Shopify announced that it would come out with a BNPL product that would "enable merchants to sell more—enable you to sell more—increase your cart sizes and inevitably increase conversion rates because there is that new choice of how a consumer wants to pay." But of course none of this was "new" because Sezzle had been offering it for years.

68.     Then, later in 2020, instead of talking with Sezzle about working together, Shopify chose to enter into a BNPL partnership with a company called Affirm, which at that time didn't even have a "pay in four" BNPL product like Sezzle's. Nor, on information and belief, did Affirm cater to the types of small to medium-sized merchants that Sezzle did and that comprised the vast majority of Shopify-based stores. But Shopify's reasons became clear because in exchange for choosing Affirm, Shopify received warrants to purchase 20,297,595 shares of Affirm's stock for $.01 per share.[7] Shopify's warrants automatically vested when Affirm conducted its initial public offering six months later. Just days after

---

[7] See Affirm Holdings Inc.'s ("Affirm") November 18, 2020 S-1 Registration Statement at 172.

23

Affirm's initial public offering, those shares became worth well over $2.3 billion.

69.    Then, one year after Shopify partnered with Affirm, on June 10, 2021, Shopify launched its BNPL product called "Shop Pay Installments." Shopify immediately incorporated Shop Pay Installments into the Shop Pay accelerated checkout which, as explained earlier, saves and prefills consumers' payment and shipping information so that their orders can be completed more quickly and so Shopify can capture the consumers' information and lock them into using Shop Pay for future purchases.

70.    In addition, after Shopify incorporated Shop Pay Installments into Shop Pay, Shopify installed and activated Shop Pay Installments as a default on all Shopify-based merchants' websites. Shopify also made it so merchants would receive payments from Shop Pay Installments transactions into the same bank account as they receive payments associated with traditional Shopify Payments transactions.[8]

71.    According to Shopify, its Shop Pay Installments "buy now, pay later solution," is now "the largest installment payment provider for Shopify merchants in the United States."[9]

---

[8] https://help.shopify.com/en/manual/payments/shop-pay-installments/getting-paid#processing-rates-and-fees-for-shop-pay-installments.

[9] https://www.shopify.com/shop-pay-installments.

72.    Shop Pay Installments is also priced similarly to Sezzle, charging merchants a per-transaction fee and a percentage of the transaction amount (this percentage is higher than in traditional credit card transactions because it includes traditional processing fees and the repayment risk associated with accepting installment payments from the consumer).[10] Shopify therefore used Shop Pay Installments to significantly enhance Shopify's profitability because it earns more than it does in a Shopify Payments transaction. As a result, Shop Pay Installments is able to protect Shopify's main revenue stream (from Shopify Payments), while also increasing Shopify's potential revenues from transaction fees.

73.    Shopify markets Shop Pay Installments to merchants by saying: "Get Paid up front in full while letting customers split purchases into interest-free payments, or monthly installments. Available online and in-store. No hidden, or late fees. Plus no impact to customers' credit scores."[11] And Shopify says that consumers who use Shop Pay Installments spend up to 50% more on their purchases, and abandon their shopping carts (before purchasing) 28% less.

---

[10] https://help.shopify.com/en/manual/payments/shop-pay-installments/getting-paid#processing-rates-and-fees-for-shop-pay-installments ("When a customer uses Shop Pay Installments, [the merchant is] charged a higher transaction fee because it also includes the standard Shopify Payments processing fee.").

[11] https://www.shopify.com/shop-pay-installments.

**VII.    Not content with just dominating the market for Drag-and-Drop E-Commerce Platforms, Shopify leveraged its position to take over the BNPL market on Shopify.**

74.    This isn't a story about Shopify copying Sezzle to try to compete fairly. Sezzle wants healthy competition, which only benefits the merchants and consumers it serves. And Sezzle knows that it would have continued to win consumers' and merchants' business, and grow its revenues, despite Shopify's copycat BNPL offering.

75.    But healthy competition was never in Shopify's gameplan. Instead, Shopify set up several artificial roadblocks that make it incredibly hard for consumers to make purchases using Sezzle on Shopify-based merchants' websites and make it financially infeasible for Shopify-based merchants to allow their customers to use Sezzle to make purchases. These efforts included several measures designed to steer business away from Sezzle and other BNPL providers, and to Shop Pay Installments including:

- Installing Shop Pay Installments as a default checkout option, while obscuring Sezzle and other BNPL options in the checkout process.
- Decreasing the functionality of Sezzle and other BNPL providers.
- Imposing a financial penalty on merchants and charging them for using Sezzle and other third-party payment services.

**A.    Shopify hid Sezzle from checkout screens, and then prevented Sezzle from signing up new merchants.**

76.    Even before it launched Shop Pay Installments, Shopify started

testing changes or updates to Shop Pay and buried Sezzle as a checkout option on Shopify-based merchants' websites. This caused merchants to think that Sezzle was removed and wouldn't be coming back. But when merchants complained, Shopify's technical support untruthfully told them that Sezzle caused the problem and it was all caused from a bug in "Sezzle's" software.

77.    Indeed, after Sezzle verified that its software wasn't causing the problem, Shopify confirmed that Sezzle's "disappearance" was caused by *Shopify's* testing. To ease merchants' concerns about this problem, Sezzle took action and sent an email to those merchants explaining what happened and that the issue wasn't caused by Sezzle and was instead caused by Shopify's testing. Sezzle also urged them to contact Shopify with any questions.

78.    Shopify apparently didn't like Sezzle telling the truth. And in an act of pure power, Shopify instantly reacted by strong-arming Sezzle into emailing merchants to tell them that Sezzle hadn't actually been removed from their websites, but instead that certain customers had merely "experienced a different flow." Shopify also told Sezzle that its message had to come across as if Sezzle had verified this. And Shopify's demand was laced with a thinly veiled threat: Shopify's C-level management was watching and would take significant action if Sezzle didn't comply. So, fearing that Shopify would do something to cause more harm to Sezzle on its platform, Sezzle grudgingly sent the message. But

Sezzle made it clear that Shopify (and not Sezzle) was behind the "different flow" explanation for Sezzle's disappearance from merchants' websites.

79.    Shopify apparently didn't like this either. It then demanded that Sezzle's CEO send a *new* email to merchants to further diminish Shopify's responsibility for Sezzle not being available on their websites. Shopify warned Sezzle too that Shopify's CEO was behind this request, and that he wanted Sezzle's CEO to essentially vouch for Shopify's supposed good intentions towards its merchants. While this was happening, Shopify relegated Sezzle's functionality to "beta" across the entire Shopify platform, which prevented any Shopify-based merchants from signing up with Sezzle. And Shopify refused to reinstate Sezzle's full functionality until after Sezzle's CEO sent the email.

80.    This shows Shopify's market power and willingness to wield that power to get what it wants and to harm Sezzle and other similar BNPL platforms.

**B.    Shopify put up roadblocks to force consumers to use Shop Pay, and to make it incredibly difficult for consumers to use Sezzle.**

81.    Since launching Shop Pay Installments, Shopify has taken significant steps, and built up significant barriers, to ensure that it earns as much revenue as it can from each transaction on its merchants' websites, and that its ability to earn those fees isn't eroded or threatened by competition. And Shopify used Shop Pay as its number one tool to do this.

82.     Shopify uses Shop Pay to protect its Shopify Payments revenue stream by making it incredibly hard for consumers to find Sezzle (or other similar BNPL providers) on Shopify-based merchants' websites, and making it practically impossible for those consumers to use Sezzle to complete purchases on those websites. As shown below, Shopify effectively buried Sezzle deep within its merchants' checkout sequences, behind multiple clicks and confusing prompts that make it hard and impractical for consumers to use Sezzle to buy products.

83.     Shopify has done this while pervasively embedding Shop Pay into its merchants' checkout flows to the point that consumers, even those that want to use Sezzle or other similar BNPL providers, are all-but forced to make their purchases with Shop Pay (including Shop Pay Installments).

84.     For example, in order to use Sezzle to purchase an item, the consumer is confronted with a labyrinth that often starts with Sezzle's availability on the merchant's website being prominently displayed on the product page like below. This makes the consumer believe that they'll be able to make their purchase through Sezzle.



85.     After the consumer adds an item to their shopping cart and clicks on the checkout button, they're taken to the checkout process shown below. But in order to use Sezzle, the consumer has to keep scrolling all the way to the bottom of the screen and select the radio button next to "Buy Now, Pay Later with Sezzle" that is buried near the bottom of the screen. That looks like this:



86.     Then, to use Sezzle, the consumer selects the radio button next to

Sezzle, and has to scroll further down to click the "Pay now" button, like this:



87.     At this point, despite choosing to pay with Sezzle, Shopify doesn't actually take the consumer to Sezzle. Instead, Shopify redirects the consumer to the top of the checkout screen where red boxes around the email and contact information tell the consumer to enter their email address and contact information in order to move forward with the transaction. That looks like this:



88.     After the consumer types in their email address and contact

information, Shop Pay then sends them a verification text or email. And once the

consumer verifies their information, they're then prompted to complete the

purchase using Shop Pay, like this:



89.    When the consumer finally reaches the options shown above in the

checkout process, they can only proceed with Sezzle if they first click on the tiny link at the bottom of the screen to "Check out as guest." This link will reactivate the previously hidden payment options, including Sezzle. But if the consumer selects the large "Pay now" button, they'll end up completing the purchase using Shop Pay or Shop Pay Installments (presumably Shop Pay Installments if the consumer was planning to use Sezzle). Not only will the consumer not use Sezzle in this situation, the consumer may not even realize that they're effectively being forced to use Shop Pay or Shop Pay Installments. This is especially likely if the consumer selects to "pay in 2 installments" because the consumer may well believe that those installment payments are being arranged through Sezzle (after all, the consumer began the checkout process by choosing to pay in installments with Sezzle, the consumer knows Sezzle offers installment payments, and the consumer never affirmatively selected Shop Pay or Shop Pay Installments for the purchase).

90.    The response from merchants and consumers to Shopify's manipulation to hide Sezzle has been overwhelmingly negative. And many merchants and consumers have complained that they can't find Sezzle in comments like this:

- "We are having an issue with Sezzle not being an option at checkout. I'm losing customers because of it."
- "Im [sic] in my check out right now on my store and still do not see an

option for sezzle to check out. I only see shop pay. If I'm not finding the option neither are my customers...The only way I'm able to fix it [] seems is to deactivate shop pay all together."

- "It says Sezzle is an option at checkout but Shopify takes over and denies it. Can't find Sezzle at checkout."

91.    One merchant summed up these obstacles in a post on a Shopify message board titled "Why is Shop Pay blocking other checkout options?" That merchant complained "SHOP PAY blocking poeple [sic] from progressing to checkout as a guest or use other payment options. When SHOP PAY is enabled, when I click on the CHECKOUT Button, it forces me to SHOP PAY app. It does not let me progress to checkout where I can select other payment options or check-out as guest."

92.    Other merchants echoed those frustrations, and complained about the impact on their sales:

- "I'm having the exact same problem. It's creating chaos with customers either leaving our checkout because they cannot figure out how to order via AfterPay or placing orders with ShopPay in error and then ringing us asking for refunds."

- "Same issue, I have complained about it before and they do not care. I think it's totally intentional. People should be able to checkout with the method they would like, not be forced into using Shoppay. I know I'm losing sales over this."

93.    These are just a few of the complaints and other similar merchant complaints include comments like:

- "I am having similar issues with Shop Pay. After a customer clicks on Shop Pay once they are auto-redirected to Shop Pay on all subsequent

checkouts."

- "If I want to use Shop Pay I will click on it once I'm ready to checkout. But if I already know I want to pay via another method and I hear my phone buzz with a Shop Pay code when I haven't selected Shop Pay it irritates me. To take extra steps during checkout to stop receiving the Shop Pay code when I'm wanting to pay by another option doesn't create a good customer experience."

- "we get a query at least twice a day between the sites complaining they can't pay by their preferred method. I understand they can and understand how they can manoeuvre [sic] around it but many customers simply don't."

- "Shopify hijacks [customers'] checkout and automatically applies shop pay, then they can't figure out how to get out and leave."

- "Sopify [sic] is trying to monopolize ecommerce and forcing shp pay on everyone. . . . What if I want to pay with Klarna? What if I decide on Paypal? Or other payment options that are available? So custoemr [sic] has to somehow KNOW that they can scroll down to the very bottom and click on that super tiny link "Continue as guest" and that is what they need to do? That won't happen, they are not going to spend more than a few seconds trying to figure htis [sic] out before they just leave."

94.    Nevertheless, and despite receiving these types of complaints,

Shopify hasn't removed, and if anything has only fortified, these barriers that

force consumers to use Shop Pay. Indeed, Shop Pay is set up to lock in the

consumer forever. This is because if the consumer enters their email address

even once (and other information if the customer is new to Shop Pay), Shop Pay

uses cookies to remember that consumer's information for one year.[12] This means

that for the next year that consumer will be automatically recognized by Shop

---

[12] *See* https://www.shopify.com/legal/cookies#what-are-cookies.

Pay on any Shopify-based merchant's website, and the consumer will automatically encounter this same forced Shop Pay/Shop Pay Installments experience. And because those year-long cookies restart every time that consumer makes a purchase using Shop Pay or Shop Pay Installments, consumers are often perpetually forced to use Shop Pay or Shop Pay Installments to make their purchases.

95.    Shopify even markets Shop Pay Installments' tight integration with Shop Pay, and its ability to compel consumers to choose it perpetually, as a supposed performance advantage over Sezzle.[13] Shopify's COO admitted that Shop Pay Installments has achieved dominance on the BNPL aftermarket because of its tight integration with Shop Pay, and because consumers are locked into using Shop Pay on Shopify.[14] Shopify has also bragged that Shop Pay Installments helps merchants realize higher order volumes because Shop Pay allows consumers to get through the checkout process way faster than other BNPL providers. But, of course, this speed differential is all engineered by and to benefit Shopify. And it's no wonder that consumers buy less through other

---

[13] *See* https://www.affirm.com/business/blog/monthly-shop-pay-installments-more-sales.

[14] *See* Affirm 2023 Investor Forum Transcript (available at https://investors.affirm.com/static-files/6733ba2f-ab90-46db-ab4a-5396d33774ba).

BNPL providers when Shopify effectively forces consumers to use Shop Pay or Shop Pay Installments, and makes it so difficult to make purchases with other BNPL providers.

96.     There's no legitimate business purpose behind Shopify's obfuscation. Shopify built these barriers for one reason, and one reason only—to protect its massive transaction fee revenue source and to ensure its ability to get those fees through Shop Pay and Shop Pay Installments going forward. In fact, it's clear that Shopify would rather have consumers abandon their purchases altogether out of frustration with being locked into Shop Pay (and for the merchants to lose those sales), than see those transactions processed by Sezzle (or other similar third parties) outside the reach of Shopify's transaction-fee tentacles. This harms both merchants and consumers.

97.     It's no surprise then that Shop Pay Installments was an immediate success. Not long after its launch, approximately 200,000 Shopify-based merchants began offering Shop Pay Installments.[15] This success also coincided with a commensurate, if not more drastic, reduction in the number and amount of transactions processed through Sezzle by Shopify-based merchants. Sezzle also began losing its existing merchant customers, and lost even more potential

_____

[15] "Affirm Reports Fourth Quarter and Fiscal Year 2022 Results" August 25, 2022.

new merchant customers and consumer BNPL transactions.

**C.    Shopify uses its market power to penalize merchants on every Sezzle transaction.**

98.    Not satisfied with simply making it almost impossible for consumers to buy products with Sezzle, Shopify decided to also make accepting Sezzle financially inviable for Shopify-based merchants.

99.    On June 16, 2022, one year after launching Shop Pay Installments, Shopify changed the terms of its merchant agreements and started charging merchants who use Shopify Payments (approximately 90% of Shopify-based merchants in the U.S,) a 1%-2% penalty for every transaction processed through Sezzle or other third-party payment platforms ("Third-Party Payment Fee" or "Penalty Fee"). Before June 16, 2022 Shopify charged this type of fee, if at all, only to the small percentage of merchants in the United States that weren't enrolled in Shopify Payments.

100.    Shopify's Penalty Fee for using rival payment platforms acts as a private tax on merchants, which merchants must then either swallow or pass on to their customers. Not surprisingly, this fee prompted considerable confusion among, and complaints from, Shopify-based merchants. They argued that Shopify's fee was so harmful that they couldn't use Sezzle anymore:

- "I also now see that Shopify is charging me a 1% transaction fee for using your service... I've deactivated Sezzle."

- "Shopify is now charging fee to use sezzle which I can no longer afford. I average $500,000 a year in sales. Can I please have a lower interest rate?... I was hoping we could negotiate down to a 3% interest but it that's not the case I will have to close my account as of July 31st."

- "I'm interested in adding Sezzle back to my website. I currently use Shopify. I originally removed Sezzle because between yalls fee and Shopify's, it was too much for my small business. Is there anyway for the fee to be lowered?"

- "I just checked back a few bills and it looks like anytime a customer uses Sezzle, that Shopify is charging us a fee.... It almost makes more sense to just drop Sezzle altogether then and use ShopPay... I've been with Sezzle for a while, so I would hate to do that but times are tought [sic] and we are trying to make every charge make sense."

- "The trouble I am having is with the new fee that Shopify is adding, which is going to push me to the point where it is no longer in my best interest to continue with sezzle and I have been weighing my options between sezzle, and the shop pay. Please let me know if there is any way we can negotiate this fee, so I can continue to use Sezzle and can weigh my options with this new fee being added onto an already high fee."

- "Hi! I have been with Sezzle for many years now. Shopify is now charging us shop owners an additional fee on sezzle orders and my business cannot sustain this. I think my only option is to cease using sezzle as a payment option."

- "Unfortunately the overall combined fees imposed by you and Shopify will make our partnership arrangement inviable. Please delete our account with Sezzle."

Many merchants then terminated their relationships with Sezzle or requested pricing concessions from Sezzle to try to blunt the impact of Shopify's Third-Party Payment Fee.

101.    Other merchants complained that because Shopify was charging fees to use Sezzle, they were locked into a worse performing product:

- "NO wonder once I moved to shopify my checkout abandonment is so much higher than previously. I'm tempted to use another payment gateway but Shopify charges an extra 2% to their merchant fees, so it's making people HAVE to use them."

- "People want to use alternative payment methods to CC only and Shopify are forcing us to pay extra fees on offering these alternatives. The more I use shopify the more I find negativities of the system... and increased costs 😔."

- "the fees are even more noticeable now due to inflation and most customers are looking to shop with payment installments."

- "This is absolutely ridiculous as I had the same experience and I have been searching high and low for evidence of others who have had these charges all of a sudden since July, there was no email to advise of this 2% additional fee to afterpay transactions and support could not confirm that this email was sent after I asked them several times. ***Support basically told me to use shop pay instead...***" (emphasis added)

- "Recently, I noticed on my billing that I'm being charged transaction fees when my customers use a "third party" at checkout ie AfterPay Klarna Sezzle. The fee is around 2% of the order. This wasn't on my billing in the past nor did I notice it on the order timeline. My store has been active on the basic plan for the last 5 years. None of my previous bills had these fees."

- "It is absolutely disgusting how Shopify charges this additional 2% fee! Don't try to justify it, 3rd party merchants are a plug in and should be available as part of the subscription. I hope people leave Shopify in droves, its greed that's all it is!!!!!!!"

102.    In addition to increasing costs to merchants and consumers, Shopify's Third-Party Payment Fee caused Sezzle to lose business from its then-existing merchant customers as they began to deactivate their accounts with Sezzle to avoid paying the extra Third-Party Payment Fee imposed on them by Shopify. On information and belief, these merchants switched to using Shop Pay

Installments for the vast majority, if not all, BNPL purchases on their Shopify-based websites. In addition, on information and belief, Sezzle also missed out on enrolling new Shopify-based merchants following Shopify's Third-Party Processing Fee's implementation because, to avoid paying that fee, merchants opted to offer Shop Pay Installments instead of Sezzle for BNPL transactions on their Shopify-based websites. Sezzle also lost out on signing up new retail customers because of this as well.

    **D.**    **Shopify further cemented its dominance by telling merchants that Sezzle is being removed from Shopify's platform.**

103.    Around the same time it launched its Third-Party Payment Fee, Shopify also began telling its merchants that Sezzle (and other BNPL providers) would no longer be available as payment options. Shopify bluntly told merchants that Sezzle would be "deprecated from our platform," and that it would "soon be unavailable" on their websites. Of course, this wasn't true, and merchants just had to download an updated version of Sezzle (which Shopify could have done automatically for them) to keep using Sezzle. But Shopify knew that making this announcement would cause at least some merchants to simply abandon Sezzle (and likely shift more business to Shop Pay Installments). Many merchants even complained that they'd lose access to Sezzle:

- "Looks like they'd rather eliminate the competition rather than let businesses choose what they want to use. At least that's all I can guess without any reason given at this point by Shopify. So far, I've only seen the

announcement."

- "Exactly, that will impact a lot of business. Some of my most loyal repeat customers place large orders utilizing sezzle, klarna etc... really not cool!"

- "No explanation. Nothing. At least ask if you wanted to get rid of one. Customers depend on these payment plan options."

104.    Several other merchants stopped offering Sezzle because they wrongly believed it would no longer be available on Shopify.

105.    Shopify knew from experience that merely telling merchants that Sezzle would be unavailable would cause merchants to abandon Sezzle, driving sales toward Shop Pay Installments. So Shopify ignored its merchants' complaints, didn't correct its messaging, and gladly accepted all of the increased orders flowing to Shop Pay Installments from its misleading "deprecation" announcements.

### E.    Shopify injures merchants and Sezzle by withholding Shopify order identification numbers for purchases made with Sezzle.

106.    Shopify also cut off its merchants' ability to obtain Shopify order identification numbers ("Order IDs") for purchases made through Sezzle and other similar third parties. This took away a valuable tool merchants relied on to perform the very important process (known as "reconciliation") of verifying and matching purchase orders against inventory and sales data. Specifically, reconciliation involves comparing (and then "reconciling") information from purchase orders, inventory records, supplier details, and bank statements.

Reconciliation is key to retail merchants because it helps them optimize inventory levels, which helps avoid overselling or underselling of products, and makes sure their finances are accurate.

107.    Shopify Order IDs used to be provided with every purchase, including purchases made through Sezzle and other similar third parties. This allowed Sezzle to provide the same Order ID in its communications with its merchants that the merchants received from Shopify (so everyone was speaking the same language). Merchants relied on Order IDs as the backbone of their reconciliation process. Knowing this, Shopify decided to make it impossible for Sezzle and its merchants to speak the same language by refusing to provide Order IDs to Sezzle for purchases through Sezzle (while Shopify continued providing Order IDs for purchases made through Shop Pay Installments). This made it incredibly difficult for merchants to perform the reconciliation process on orders made through Sezzle, and comparatively easier on orders made through Shop Pay Installments.

108.    Many merchants complained about losing access to Order IDs for purchases made through Sezzle. These complaints included:

- "now I have no easy way of matching transactions in my system. I am not willing to spend hours trying to figure out what the order number is for these transactions…I don't have the time to spend reconciling this"

- "The reason behind our request to end the partnership [with Sezzle] is fairly simple, and I can explain…the reference ID is no longer the Shopify

45

order, which makes it too difficult for the finance team to reconcile Sezzle transactions."

109.    Despite these types of complaints, and its clear understanding that it was hindering its merchants' ability to conduct their businesses efficiently, Shopify refused to reinstate Sezzle's access to Order IDs. Sezzle has undoubtedly lost merchant customers to Shop Pay Installments because of this. And Shopify surely intended that this practice would give it an advantage, while harming merchants, consumers, and competitors alike.

**F.    Shopify also disallowed Sezzle's real-time inventory locking feature for Shopify-based merchants' websites.**

110.    One of Sezzle's most appreciated innovations for Shopify merchants was its real-time inventory locking feature, which helped prevent the costs and frustrations from oversales. Oversales typically occur when merchants run sales, or on especially busy days like on Black Friday and Cyber Monday, when a customer is inadvertently allowed to purchase a product that has sold out during the rush of traffic associated with the particular sale. Oversales cause merchants to lose sales because they have to refund the purchase of the sold-out product, and because consumers get upset with them when they have to renege on a purchase, especially when the purchase was made at a lower price (during a sale) or for a gift to someone (like during Black Friday or Cyber Monday).

111.    Sezzle's inventory locking feature worked by removing a product

46

from the Shopify merchant's inventory for a set period of time once that product was placed into the consumer's shopping cart. This gave the consumer time to complete their purchase. Shopify knew that real-time inventory locking was a valuable feature that Sezzle offered to Shopify-based merchants, and that taking away that feature would cause some merchants to turn away from Sezzle and toward Shop Pay Installments. So Shopify cut off Sezzle's access to the information it needed to offer real-time inventory locking to Shopify-based merchants. On information and belief, Shopify then actively marketed its own real-time inventory locking capabilities to merchants as a differentiating feature between Shop Pay Installments and Sezzle.

112.    Cutting off Sezzle's real-time inventory locking feature has harmed both merchants and consumers. Sezzle has also lost business from its Shopify-based merchant customers because those merchants oftentimes disable Sezzle when they hold sales, or during busy shopping days like Black Friday and Cyber Monday, to avoid oversales. And when this happens, merchants sometimes don't re-enable Sezzle on their websites. All of this not only causes Sezzle to lose some of the most lucrative, high-volume revenue opportunities during the biggest consumer purchase times, it also erodes Sezzle's relationships with its merchant and retail customers, and likely also damages its ability to sign up new merchant and retail customers as well. Merchants also suffered from this conduct

when they likely experienced oversales because Shopify cut off Sezzle's ability to

provide real-time inventory locking for sales made through Sezzle.

**G.      Shopify hampered Sezzle's ability to market itself and serve its merchant customers.**

113.    Since it launched Shop Pay Installments, Shopify engaged in other

underhanded tactics with the goal of undermining Sezzle's ability to compete

fairly.

114.    For example, Shopify has used its control over its platform to

prevent Sezzle from uploading anything but a grainy, low-resolution image for

Sezzle's checkout option. While at the same time, Shopify uses high-resolution

images that both merchant and retail customers associate with reliable online

payment services for its Shop Pay Installments logo. This has the effect of

reducing Sezzle's perceived quality to merchants and retail customers. And this

disparate treatment benefits Shopify's ability to compete for merchant and retail

customers, at Sezzle's expense. Sezzle has been asking Shopify for years to let it

use a higher resolution (and better looking) logo—and it's probably one of the

easiest things Shopify could do. But Shopify has refused.

**H.      Merchant and retail customers are also losing substantial benefits they get from Sezzle by being forced to use Shop Pay Installments.**

115.    Sezzle offers substantial benefits to merchants and retail customers

that Shop Pay Installments doesn't provide. For example, on information and

belief, Sezzle approves higher percentages of BNPL orders on Shopify-based merchants' websites than are approved through Shop Pay Installments. And, on information and belief, Sezzle also approves higher percentages of retail customers for BNPL services than Shop Pay Installments does. In other words, Sezzle offers BNPL services to large numbers of U.S. consumers who likely wouldn't receive them at all from Shop Pay Installments.

116.    Sezzle also offers retail consumers the flexibility to reschedule payment dates while Shop Pay Installments doesn't offer this type of flexibility.

117.    Shop Pay Installments doesn't offer anything like the "Sezzle Up" program, which allows consumers to build their credit histories through voluntary reporting of their payment transactions. Customers who made on-time payments while enrolled in Sezzle Up have seen their credit score increase within the first four months of reporting, and no analogous functionality, and therefore no analogous benefit, is even possible with Shop Pay Installments.

118.    All of these Sezzle-exclusive features benefit lower income consumers and consumers with lower credit scores, providing them with more buying power on better terms than they could obtain through Shop Pay Installments or traditional payment methods. And those consumers are being deprived of these benefits because Shopify has made it so technically difficult to use Sezzle on Shopify-based merchants' websites, and so financially prohibitive

for Shopify-based merchants to offer Sezzle to those consumers. By depriving retail customers these benefits, Shopify is also limiting the consumer base available to its Shopify-based merchants, which means those merchants have a smaller, less financially empowered customer base to sell their products to.

<strong>Shopify's Market Power in the Relevant Markets</strong>

**I.    Shopify Has Monopoly Power in the Market for Drag-and-Drop E-Commerce Platforms.**

119.    Shopify has durable monopoly power in the market for Drag-and-Drop E-Commerce Platforms in the United States.

### A.    Drag-and-Drop E-Commerce Platforms is a Relevant Product Market.

120.    Drag-and-Drop E-Commerce Platforms in the United States is a relevant antitrust market. Drag-and-Drop E-Commerce Platforms offer small to medium-sized merchants a distinct set of services, specifically powerful, easy-to-use, all-in-one software that enables them to create and maintain their own direct-to-consumer online stores, with functionalities for checkout, inventory management, fulfillment, and marketing. Other kinds of e-commerce software, such as "plug-in" based software or enterprise software, aren't reasonable substitutes for Drag-and-Drop E-Commerce Platforms because they don't provide for a user-friendly all-in-one interface. Online marketplace services, like Amazon.com, aren't reasonable substitutes because they allow merchants to sell products through the online marketplace but don't provide merchants with the

means to exercise control over the online marketing and branding of their products.

**1.    Drag-and-Drop E-Commerce Platforms offer a unique set of features.**

121.    Drag-and-Drop E-Commerce Platforms are e-commerce platforms that are easily customizable by startup and small to mid-size merchants without employing technical staffs and without engaging an expert web designer. Using a Drag-and-Drop E-Commerce Platform, users can build and customize their e-commerce stores simply by "dragging" and "dropping" various elements onto a webpage.

122.    Shopify's website highlights why Drag-and-Drop E-Commerce Platforms—its platform in particular—are unique. Shopify's merchant-facing website prominently describes its "Website Builder," which it claims provides for "effortless editing and bold ideas."[16] Shopify's Website Builder allows merchants to "[c]reate a custom website with AI," or if the merchant so chooses, "start with a customizable template," based on "hundreds of feature-packed themes."[17] Shopify then invites merchants to "Make your mark, no code needed."

---

[16] https://www.shopify.com/website/builder.

[17] *Id*. (emphasis in original).

123.    Shopify claims that it is "made for visionaries, not tech wizards."[18] In other words, the features of Shopify and other Drag-and-Drop E-Commerce Platforms are perfect for small to medium-sized merchants, who generally lack the expertise and capital to build their own comparable e-commerce stores.

124.    The features of Drag-and-Drop E-Commerce Platforms are so distinct and the switching costs are so high that a hypothetical monopolist could profitably impose a 5-10% price increase on merchants without a significant number of them leaving its platform.

### 2.    "Plug-in"-based services are not reasonably interchangeable with Drag-and-Drop E-Commerce Platforms.

125.    "Plug-in" based services aren't reasonably interchangeable with Drag-and-Drop E-Commerce Platforms. A "plug-in" is a piece of software that adds specific functionality to a website. In e-commerce, a plug-in can add functionalities such as customizations, payment acceptance, and inventory management to a merchant's website that is hosted on another platform.

126.    Small to medium-sized merchants—the core customers for Drag-and-Drop E-Commerce Platforms—wouldn't find other e-commerce platforms or custom web design to be reasonable substitutes for Drag-and-Drop E-Commerce Platforms. This is because Drag-and-Drop E-Commerce Platforms take care of

---

[18] *Id.*

tasks that most small to medium-sized merchants have neither the resources nor the skill to complete themselves, such as cybersecurity and PCI compliance, securing a hosting partner, and purchasing a domain name. In contrast to Drag-and-Drop E-Commerce Platforms, open-sourced e-commerce platforms such as WooCommerce don't provide direct customer technical support, which limits their utility to merchants that don't employ substantial IT teams.

127.    A prominent plug-in-based service is WooCommerce, which allows merchants to adapt Wordpress websites for e-commerce. As Shopify describes it, "WooCommerce is a free plug-in for WordPress. It turns WordPress blogs into ecommerce stores with their own branding, products, and checkout."[19]

128.    WooCommerce doesn't participate in the market for Drag-and-Drop E-Commerce Platforms because setting up a WooCommerce website with comparable functionality to a Shopify-based store's website requires a complex technical customization process, including choosing a hosting partner, purchasing a domain name, computer programming, PCI compliance, and software. As Shopify explains, "WooCommerce, being a plugin itself, provides only the basics out-of-the-box, and relies heavily on additional plugins for functionality."[20] The vast majority of small to medium-sized merchants wouldn't

---

[19] https://www.shopify.com/blog/ecommerce-software#5.

[20] https://www.shopify.com/compare/shopify-vs-woocommerce.

be able to complete the steps necessary to design, publish, and maintain a WooCommerce website that is comparable to a Shopify store's website, without additional design, development, and coding work, as well as downloading additional plugins.

129.   Indeed, Shopify observes that "plugins don't always work well together when integrated on WooCommerce — leading your teams to rely on developers even for minor changes."[21]

130.   This is also why merchants that use open-source e-commerce platforms tend to fail, or simply stop doing business, fairly quickly, and why those merchants do far less business than those hosted on Drag-and-Drop E-Commerce Platforms—the logistical and technical barriers to getting these businesses up and running on open-sourced e-commerce platforms are simply too high.

131.   While WooCommerce and other plug-in-based services share some characteristics with Drag-and-Drop E-Commerce Platforms, they are significantly more technically complex to use. And, merchants that choose plug-in-based services often have their own technical staff or hire a consultant to build and maintain their websites.

---

[21] *Id*.

132.     In contrast to Drag-and-Drop E-Commerce Platforms, WooCommerce is open source, meaning that its source code can be accessed and modified by anyone who is conversant with coding. This means, however, that WooCommerce is less user-friendly than Drag-and-Drop E-Commerce Platforms for small to medium-sized merchants, who generally lack technical staffs or consultants.

133.     Building an e-commerce website using a plug-in-based service like WooCommerce would also require merchants to choose a hosting partner, purchase a domain name, perform computer programming, and endure PCI compliance, among other tasks that the vast majority of small to medium-sized merchants would find difficult and view as distracting them from their businesses.

134.     Also, in contrast to Drag-and-Drop E-Commerce Platforms, open-sourced e-commerce platforms like WooCommerce don't provide direct customer technical support, which limits their utility to merchants that don't employ substantial IT teams.

135.     Drag-and-Drop E-Commerce Platforms are also priced in a manner that is particularly suited for small to medium-sized merchants.

136.     As Shopify itself summarized, when adding up the costs of payment fees, additional plugins and software, you'll pay 32% more in platform and tech

stack costs on WooCommerce than Shopify, on average."[22]

### 3. Custom-built, enterprise-level e-commerce platforms are not reasonably interchangeable with Drag-and-Drop E-Commerce Platforms.

137.    Custom-built, enterprise-level e-commerce platforms are not reasonably interchangeable with Drag-and-Drop E-Commerce Platforms.

138.    Enterprise-level e-commerce platforms are designed for large-scale retail businesses with complex needs, offering features like scalability, robust security customization, and strong integration capabilities.

139.    While these attributes are attractive to large businesses with complex needs, custom-built enterprise-level platforms require significantly more up-front financial and time investment to design and build the bespoke software they run on, and they don't offer the user-friendly attributes that are attractive to small to medium-sized merchants.

### 4. Online marketplace services are not reasonably interchangeable with Drag-and-Drop E-Commerce Platforms.

140.    Online marketplace services—such as Amazon—are also poor substitutes for Drag-and-Drop E-Commerce Platforms.

141.    According to the Federal Trade Commission and 17 state attorneys general (including the Minnesota Attorney General), online marketplace services,

---

[22] *See id.*

"encompass a suite of services that facilitate sellers making online sales to U.S. shoppers without having to directly operate an online store."[23]

142.    While online marketplace services provide a platform for merchants to sell products to end consumers, the similarities with Drag-and-Drop E-Commerce Platforms end there.

143.    Although a seller on an online marketplace relies on the marketplace for the consumer to find its goods (*i.e.,* by searching for "wool mittens" on Amazon), merchants use Drag-and-Drop E-Commerce Platforms precisely because they want to build their own brands (*i.e.,* Maggie's Mittens) with a customizable "look and feel," and user experience.

144.    Drag-and-Drop E-Commerce Platforms and online marketplaces don't consider each other competitors when they set pricing.

145.    The economic model of online marketplace also differs from that of a Drag-and-Drop E-Commerce Platform. A Drag-and-Drop E-Commerce Platform charges monthly or annual fees to merchants and also charges fees for various add-on services, including payment processing. An online marketplace, in contrast, takes a commission—usually a substantial one—on each sale that a merchant makes. Thus, as a merchant grows its sales, an online marketplace

---

[23] Compl. ¶ 188, *FTC et al. v. Amazon.com, Inc.* (W.D. Wash. Nov 22, 2023).

becomes a significantly inferior alternative to a Drag-and-Drop E-Commerce Platform.

**5. The barriers to entry are high in the Drag-and-Drop E-Commerce Platform Market.**

146. The Drag-and-Drop E-Commerce Market is characterized by high barriers to entry.

147. The relevant market has significant network effects, such that any successful entrant would have to accumulate a large base of merchants to attract developers to create apps and plugins, *while also* having a sufficient stable of apps and plugins to attract merchants to the platform. This would require a prospective entrant to outlay significant capital expenses to simultaneously market itself to merchants and developers. These marketing expenses would be in addition to the cost of building the platform itself.

148. Significant switching costs for merchants, like the ones described earlier for Shopify, also contribute to entry barriers, in that no prospective entrant would be able to win a significant number of merchants from other Drag-and-Drop E-Commerce Platforms. Thus, any prospective entrant would be almost completely dependent on new merchants to justify its investment.

149. Reputational barriers are also significant. Small to medium-sized merchants—the core customers of Drag-and-Drop E-Commerce Platforms— entrust their Drag-and-Drop E-Commerce Platforms to build their own brands

and literally help them achieve their dreams. Given the high personal stakes, small to medium sized merchants are unlikely to trust their businesses to an upstart entrant.

150.    Because of these barriers to entry, no company has successfully entered the Drag-and-Drop E-Commerce Platform Market since Square in 2019.

### 6.    The relevant geographic market is the United States.

151.    The geographic dimension of this market is the United States. The United States is the area of effective competition between Shopify and other e-commerce platforms selling to United Staes merchants.

152.    Market participants recognize this in the ordinary course of business. While Shopify and certain other market participants offer online e-commerce platforms in other countries, there are differences in product offerings, consumer expectations, language, and regulatory frameworks depending on the country in which the merchant is located.

153.    U.S. merchants therefore would only select a Drag-and-Drop E-Commerce Platform that is available in the United States, even in the face of a small but significant and nontransitory increase in price by a monopoly U.S. provider of such services.

154.    While Shopify is based in Canada, it has a significant presence in the United States, has the requisite familiarity with the U.S. e-commerce market,

markets its services heavily to U.S. merchants, and therefore participates in the U.S. market for Drag-and-Drop E-Commerce Platforms.

**B.   Shopify has monopoly power in the market for Drag-and-Drop E-Commerce Platforms.**

155.   Shopify's ability to raise prices and exclude rivals is direct evidence of Shopify's monopoly power.

156.   Shopify has the ability to increase prices to merchants in the Drag-and-Drop E-Commerce market without competitive restraint from rivals.

157.   Shopify's Penalty Fee for using third-party payment platforms, has the effect of a price increase to merchants, which Shopify was able to enact without reprisal from rivals.

158.   The fact that Shopify has been able to maintain its Penalty Fee for nearly three years demonstrates that other Drag-and-Drop E-Commerce Platforms do not adequately constrain its monopoly power.

159.   Shopify's monopoly power is also evident from its ability to impose the anticompetitive restraints like those described earlier. In a competitive market, Shopify wouldn't impose restrictions that prevented third-party payment services (like Sezzle or other third-party services) from being used by merchants or consumers, as such restrictions devalue the Shopify platform and the merchant websites that utilize it. But because Shopify is a monopolist, it doesn't need to worry about merchants migrating to other platforms in response

to its anticompetitive tactics.

160.    Indirect evidence also confirms Shopify's monopoly power in the Drag-and-Drop E-Commerce Platform market.

161.    On information and belief, Shopify's share of the Drag and Drop E-Commerce Platform market in the United States exceeds 70%. As of 2023, total U.S. e-commerce sales volume exceeded $1.119 trillion, and Shopify claimed that it processed about 10% of that sales volume, or approximately $111.9 billion. But over $971 billion of the total U.S. e-commerce volume was accounted for by the 20 largest e-commerce stores, including Amazon and Walmart, 18 of which were utilizing custom-built enterprise e-commerce software. Of the remaining $147.9 billion in e-commerce volume, Shopify's volume of $111.9 billion amounted to 76%.

162.    In fact, Shopify itself claimed that year that it had a 70% market share of the 800 leading direct-to-consumer brands.[24] Shopify linked its claim to a study, titled "Shopify Owns DTC, which depicted Shopify's 73% share among the top 800 direct-to-consumer brands.[25]

---

[24] *See* https://www.shopify.com/compare/shopify-vs-woocommerce.

[25] *See* https://2pml.com/2023/11/03/owns-dtc/.



And when WooCommerce and "custom build" (which are not reasonable substitutes for Drag-and-Drop E-Commerce Platforms) are excluded, Shopify's share—according to this study—would exceed 95%.

163.   In 2024, Shopify's e-commerce U.S. sales volume increased to approximately $166.6 billion.

## II. Shopify Has Monopoly Power in the Market for BNPL Services on the Shopify Platform.

### A. BNPL Services on the Shopify Platform is a Relevant Market.

164.    There exists a relevant market, the product dimension of which is BNPL Services on the Shopify Platform. This relevant market exists completely within a broader relevant market for BNPL Services (defined below).

165.    This relevant market consists of BNPL services that are available to merchants that utilize the Shopify Platform to host their websites.

#### 1. BNPL services offer a unique set of features that are not reasonably interchangeable with other payment services.

166.    BNPL Services operate in a distinct space in federal lending regulations, which insulates them from competition from other financial services. Specifically, Federal Reserve Regulation Z, 12 C.F.R. § 226.1, which implements the Truth in Lending Act, 15 U.S.C.A. § 1601-1667f, applies only to individuals or businesses that offer credit to consumers "subject to a finance charge or [] payable by a written agreement *in more than four installments*."[26]

167.    Compliance with the Truth in Lending Act is costly and complicated for businesses, especially for small businesses and startups. Thus, companies that fall outside of the Act's purview can offer their services with lower operational costs than those that are subject to the Act.

---

[26] 12 C.F.R. § 226.1(c)(iii) (emphasis added).

168.    Thus, there is a distinct market for BNPL Services, interest-free loans that are payable in four or fewer installments. And because of their connection to federal regulations that limit these services to loans with four or fewer installments, BNPL Services are often called "pay in four" services.

169.    BNPL Service providers lend relatively small amounts to consumers and allow the consumers to pay interest-free over as few as one, or as many as four payments.

170.    BNPL Services are also qualitatively different from traditional forms of consumer lending, such as credit cards and installment loans, and are not reasonable interchangeable with them.

171.    According to an article published on Nerd Wallet, a leading personal finance website, the "Best" personal installment loans currently carry interest rates (APR) ranging from 6.5% to 9.0%.[27]

172.    BNPL services carry no interest cost to consumers (indeed they cannot charge interest, lest they fall within the scope of the Truth in Lending Act). Given the disparity between the costs of BNPL services to consumers and

---

[27] Ronita Choudhuri-Wade & Nicole Drew, Best personal Loan Lenders of May 2025, available at www.nerdwallet.com. Credit cards carry even higher interest rates, averaging over 20%. Melissa Lambarena, What is the Average Credit Card Interest Rate?, Apr. 7, 2025, (available at https://www.nerdwallet.com/article/credit-cards/what-is-the-average-credit-card-interest-rate).

other forms of consumer lending, even if a hypothetical monopolist in the BNPL market imposed a small but significant increase in price (or corresponding decrease in quality), that hypothetical monopolist wouldn't lose enough business to other forms of lending to make that price increase (or quality decrease) profitable.

173.   Shopify has an economic interest in its sales in the relevant market. Every transaction that Shopify diverts to Shop Pay Installments from Sezzle inflates its profits at the expense of merchants and consumers who prefer Sezzle.

174.   From a merchant's perspective, BNPL Services aren't reasonably interchangeable with other forms of payment because they give merchants access to a unique set of consumers—those who either have poor credit or insufficient credit history to obtain a credit card. Credit cards, by definition, don't help merchants reach these consumers.

175.   For online merchants, non-electronic forms of payment such as cash and checks, aren't easily available to consumers, and thus cannot serve as reasonable substitutes for BNPL Services.

176.   Government regulators recognize BNPL Services as a distinct product from other consumer loans. For example, the Consumer Financial Protection Board defines "Buy Now, Pay Later (BNPL) [as] a type of installment loan that typically allows you to purchase something immediately with little or

no initial payment and pay off the balance over four or fewer payments."[28]

## 2. BNPL Services on the Shopify Platform is a distinct aftermarket.

177. BNPL Services on the Shopify Platform is a distinct aftermarket of the market for Drag-and-Drop E-Commerce Platforms. Merchants' demand for BNPL Services on Shopify is entirely dependent on their Shopify subscription, which enables the merchants to sell their products on the internet, and BNPL services on other platforms wouldn't be reasonable substitutes for BNPL services available on Shopify. And Shopify's power in the BNPL Services Market on the Shopify Platform isn't constrained by competition in the market for Drag-and-Drop E-Commerce Platforms because Shopify has monopoly power in the Drag-and-Drop E-Commerce Platform market, and separately because merchants are generally unaware of Shopify's aftermarket barriers and restrictions, face high switching costs, and are effectively locked in to Shopify's platform.

178. Shopify places a series of anticompetitive restrictions on merchants that restrict their use of third-party payment systems, including BNPL services. These restraints include limits on which payment systems can appear at various stages of the checkout process, degradations on various payment systems' appearances, disabling of various payment systems' abilities to offer real-time

---

[28] https://www.consumerfinance.gov/ask-cfpb/what-is-a-buy-now-pay-later-bnpl-loan-en-2119/.

inventory locking, cutting off access to Order IDs, and a penalty for using third-party payment gateways.

179.    Shopify's anticompetitive restrictions on merchants' use of third-party payment systems aren't generally known to merchants when they sign up for Shopify.

180.    Shopify markets its services to merchants exclusively, or nearly exclusively online, and primarily through its website, www.shopify.com. But nowhere on the "Pricing" or "Solutions" pages of Shopify's website does Shopify mention these restraints.[29]

181.    Also, Shopify actively hides the blockades it places between merchants, consumers, and their preferred payment platforms. Shopify does this by boasting that "Shopify offers all the essentials out of the box, but if your business calls for something extra you have the Shopify App Store—with 13,000+ commerce apps for whatever specialized features you might need."[30] Shopify also tells prospective merchants that it offers, "APIs, primitives, and tools [to] empower dev[elopers] and partners to build the apps, themes, and custom storefronts businesses are looking for."[31]

---

[29] *See* https://www.shopify.com/pricing.

[30] *See* www.shopify.com.

[31] *Id.*

182.    The effect of Shopify's obfuscation of the true nature of committing to Shopify is increasing the information costs for merchants. When a merchant is deciding which Drag-and-Drop E-Commerce Platform to use, the merchant isn't able to factor into its decision that the ease of use of various third-party features is entirely dependent on Shopify's financial interest in competing with those features.

183.    Additionally, merchants that subscribed to Shopify before June 2022 could not have been aware of Shopify's subsequent decision to start charging penalties on all transactions involving most third-party providers. This bait-and-switch prevented millions of merchants from considering this penalty in deciding whether to subscribe to Shopify's e-commerce platform.

184.    And of course, for merchants that began using Shopify before Shopify introduced Shop Pay Installments and the various tactics for protecting it from competition, could not have foreseen that Shopify would alter its value proposition as it relates to third-party payment services.

185.    Moreover, merchants cannot reasonably estimate the total aggregate cost of all BNPL transaction fees that would be charged to them over the lifetime of their Shopify subscription. That amount, which is dependent upon consumer behavior, the merchant's business growth, macroeconomic trends, and myriad other factors, is impossible to estimate.

186.    The market shares of Shopify Installments on the Shopify Platform confirm both that Shopify has monopoly power and that its exclusionary tactics contributed to that monopoly power.

187.    Shopify merchants are essentially "locked into" Shopify because switching costs are high for them to leave Shopify for another Drag-and-Drop E-Commerce Platform.

188.    As explained above, merchants that wish to transition away from Shopify essentially need to re-build their websites from scratch on another platform.

189.    Shopify stores are built on Shopify's proprietary content management system and therefore cannot be exported to another platform.

190.    Because of the difficulty of migrating away from Shopify, merchants are often forced to engage third parties to manage the process for them—an added expense that many merchants cannot afford to take on.

191.    Barriers to entry are high in the aftermarket for BNPL Services on the Shopify Platform.

192.    And Shopify's conduct only enhances those barriers to entry.

193.    As Sezzle's experience demonstrates, any potential entrant would have to overcome the reality that it could participate on the Shopify Platform only to the extent that Shopify—the largest competitor in the relevant

market—allows it.

194.    The geographic dimension of this market is the United States. As explained earlier, BNPL Services are a creature of U.S. lending regulation. So U.S. merchants cannot realistically look outside of the United States to purchase BNPL Services. Indeed, until very recently, Shopify only offered Shop Pay Installments within the United States.

**B.    Shopify has monopoly power in the market for BNPL Services on the Shopify Platform.**

195.    Because Shopify has complete control over who can participate on its platform, it literally has the power to exclude competition in the market for BNPL Services on the Shopify Platform.

196.    The power to exclude competition is, by definition, monopoly power.

197.    Since its launch in 2021, the market share for Shop Pay Installments on the Shopify Platform has risen steadily to monopoly levels. Sezzle conservatively estimates that in 2024, Shop Pay Installments handled approximately 75-85% of all BNPL transactions on the Shopify Platform.

198.    Sezzle's lost revenues from merchant transactions on the Shopify platform corroborate Shopify's monopoly power in BNPL Services on the Shopify Platform.

199.    Sezzle transactions on the Shopify platform plummeted once

Shopify launched Shop Pay Installments and systematically shielded it from competition by making Sezzle and other BNPL services significantly more difficult and costly to use. By 2023, Sezzle's transaction volume on the Shopify platform had declined by approximately 50%. Upon information and belief, nearly all of the BNPL transactions that Sezzle lost during this period were lost to Shop Pay Installments.

III.    **Shopify uses its market power in the market for Drag-and-Drop E-Commerce Platforms to harm competition in the market for BNPL Services on the Shopify Platform.**

200.    As explained in detail above, Shopify has appreciable market power in the market for Drag-and-Drop E-Commerce Platforms in the United States.

201.    Shopify uses this market power to effectively force merchants that use its Drag-and-Drop E-Commerce Platform to also use Shopify's BNPL Services in all or nearly all of their BNPL transactions with consumers.

202.    Shopify accomplishes this tie through self-preferencing its BNPL Services over others in the checkout process, obfuscating competitors' appearances, prohibiting competitors from offering valuable value-added services to merchants (such as real-time inventory locking), and surcharging merchants when they use competitors' BNPL services.

203.    Drag-and-Drop E-Commerce Platforms and BNPL Services are distinct products.

204.    Merchants' demand for Drag-and-Drop E-Commerce Platforms is distinct from the demand for BNPL Services.

205.    Drag-and-Drop E-Commerce Platforms and BNPL Services have traditionally been sold separately. And it's efficient for Drag-and-Drop E-Commerce Platforms and BNPL Services to be sold separately. For example, Shopify existed for over a decade without offering a BNPL Service and, even then, adopted one only after seeing Sezzle's success.

206.    As noted above, merchants want BNPL Services to be offered independently from Shopify, on equal terms with Shopify's inferior BNPL product.

207.    With the exception of Shopify, Drag-and-Drop E-Commerce Platforms don't offer their own BNPL Services. Nor do Sezzle or other BNPL Service providers offer e-commerce platforms of any type.

208.    While electronic payments are necessary for merchants to engage in e-commerce, some e-commerce merchants may choose to offer forms of payment, such as credit cards, debit cards, or mobile wallets, instead of BNPL Services.

209.    Similarly, BNPL Services are available to merchants without significant e-commerce presences as well as to merchants that choose other methods of building an e-commerce presence, such as using an enterprise e-commerce solution or custom designing their own e-commerce presence.

210.    BNPL Services and Drag-and-Drop E-Commerce Platforms are priced independently from each other. An increase in the price of Drag-and-Drop E-Commerce Platforms wouldn't lead to a significant reduction in the demand for BNPL Services and vice versa.

211.    Shopify's tying arrangements affect a substantial volume of commerce in the market for BNPL Services on the Shopify Platform.

212.    Shopify has an economic interest in the sales of BNPL Services. It makes millions of dollars annually in merchant fees tied to Shop Pay Installments BNPL Services.

## Harm to Competition Resulting from Shopify's Conduct

## I.    Shopify's conduct has harmed and continues to harm merchants.

213.    Merchants suffer harm as a direct and proximate result of Shopify's conduct described throughout this Complaint.

214.    For example, Shopify's 1-2% Penalty is a direct manifestation of Shopify's monopoly power. This penalty causes merchants that process transactions on Sezzle or other non-Shopify payment platforms to pay more than they would in a competitive market to process their customers' transactions.

215.    The penalty also degrades the quality of the Shopify platform to merchants in that merchants now have fewer penalty-free options for processing payments for goods and services that they sell on Shopify websites.

216.    The loss of availability of real-time inventory locking function—key to maintaining merchants' trust with their customers—is another form of harm that Shopify's conduct has caused merchants. Because Shopify cut Sezzle and other BNPL platforms off from offering real-time inventory locking and access to Order IDs on the Shopify platform, merchants now have only one choice—Shop Pay—if they wish to utilize these valuable services.

217.    Retail merchants generally want to provide their customers with as many options to pay as possible. If a customer's preferred payment method isn't available, the customer typically blames the merchant and may look to purchase goods or services from a competing merchant. Thus, Shopify's degradation of Sezzle in the checkout process tends to frustrate online shoppers, which in turn harms their perceptions of merchants, and harms the merchants by decreasing the chances for the merchant to receive future sales from that consumer.

218.    In addition, some large merchants can negotiate transaction pricing, incentives, and other terms of service with Sezzle and other payment platforms. When Shopify makes fewer payment options practically available to merchants, merchants lose the ability to take advantage of competition among various payment platforms, including Sezzle, which results in higher prices or decreased service levels to those merchants.

II.    **Shopify's conduct has harmed and continues to harm consumers.**

219.    At its core, competition is about choice. And, fewer choices available to consumers means that there is less competition. That is precisely the case in the BNPL on Shopify market, in which, before Shopify's anticompetitive conduct, consumers who shopped at Shopify merchants' online stores could choose Sezzle alongside other BNPL services and other forms of payment on equal footing, when those options were enabled by the merchant. Now, however consumers don't see Sezzle as a payment option until late in the checkout process and don't know it's an option for payment, even if the merchant has enabled it.

220.    The lack of choice is especially indicative of a harm to competition because consumers prefer Sezzle to Shop Pay Installments and view Sezzle as a superior product. Consumers also prefer Sezzle's additional features, such as Sezzle Up, which allows them to build their credit histories, and Sezzle's payment rescheduling feature, lower minimum order amounts, use with subscription services, and Sezzle's Payment Streaks feature that rewards consumers for making on-time payments.

III.    **There is no procompetitive justification for Shopify's conduct.**

221.    The anticompetitive restraints that Shopify imposes on Sezzle, on merchants, and on consumers are not necessary to achieve any procompetitive

benefit. Even if those restraints confer some minimal benefit on competition, they are significantly broader than necessary to obtain those ends.

## IV. Shopify's conduct has injured Sezzle in its business and property.

222.    As demonstrated earlier, Sezzle's growth on the Shopify platform was increasing consistently until Shopify launched Shop Pay Installments and began diverting consumers and merchants away from Sezzle and other BNPL providers. Shopify's conduct was therefore a direct and proximate cause of harm to Sezzle's business and property—namely significant lost revenues and revenue opportunities and lost profits.

223.    Sezzle's injuries from the harm to competition, merchants, and consumers inflicted by Shopify's conduct. Sezzle's injuries are of the type that the antitrust laws are intended to prevent. In a competitive market, Shopify would allow Sezzle and other BNPL services to compete on equal footing with Shop Pay Installments. Thus, Shopify's self-preferencing and degradation of Sezzle's product reflects the lack of a competitive market (and harm to competition). Sezzle's injuries (lost transactions and revenues on the Shopify platform) are therefore directly attributable to anticompetitive conduct.

### Claims For Relief

### Count I: Monopolization

### Sherman Act Section 2 (15 U.S.C. § 2)

224.    Sezzle restates and realleges each and every allegation in this

Complaint.

225.    Shopify possessed (and continues to possess) monopoly power in the relevant market for BNPL Services on the Shopify Platform in the United States.

226.    Shopify has willfully and intentionally obtained and/or maintained its monopoly in the BNPL Market on the Shopify Platform by engaging in the exclusionary and anticompetitive conduct set forth in this Complaint. This conduct includes, at least, imposing penalties on merchants that choose to process transactions on the Sezzle platform, self-preferencing the checkout process, preventing Sezzle from offering real-time inventory locking and access to Order IDs on the Shopify platform, and downgrading the consumer experience with Sezzle.

227.    The direct, foreseeable, and proximate result of Shopify's anticompetitive conduct has been to reduce quality, increase prices, and otherwise harm competition in the BNPL Market on the Shopify Platform.

228.    Shopify's anticompetitive conduct lacks any non-pretextual procompetitive justification and/or is broader than necessary to achieve any procompetitive benefits.

229.    As a direct, foreseeable, and proximate result of Shopify's violation of §2 of the Sherman Act, Sezzle has suffered and continues to suffer harm to its

business and property.

230.    Shopify's anticompetitive conduct described above is precisely the kind of conduct that the antitrust laws seek to prevent.

231.    Sezzle is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

232.    Sezzle further seeks equitable relief in the form of an injunction preventing Shopify from continuing the unlawful conduct alleged in this Complaint and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Shopify is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the BNPL Markets, and to Sezzle and other competitors in those markets.

### Count II: Attempted Monopolization
### Sherman Act Section 2 (15 U.S.C. § 2)

233.    Sezzle restates and realleges each and every allegation in this Complaint.

234.    Shopify possessed (and continues to possess) sufficient market power in the BNPL Market on the Shopify Platform to pose a dangerous probability of monopolizing that market.

235.    Shopify possessed (and continues to possess) sufficient market

power in the BNPL Market on the Shopify Platform to pose a dangerous probability of monopolizing that market.

236.   Shopify has willfully and intentionally engaged in exclusionary, anticompetitive conduct that creates a dangerous probability of successfully monopolizing the BNPL Market on the Shopify Platform. This conduct includes, at least, imposing penalties on merchants that choose to process transactions on the Sezzle platform, self-preferencing the checkout process, preventing Sezzle from offering real-time inventory locking and access to Order IDs on the Shopify platform, and downgrading the consumer experience with Sezzle.

237.   Shopify's actions were carried out willfully and with the specific intent to monopolize the market for local search services through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

238.   The direct, foreseeable, and proximate result of Shopify's anticompetitive conduct was to increase prices, reduce quality, and harm competition in the market for BNPL Services on the Shopify Platform.

239.   Shopify's anticompetitive conduct lacks any non-pretextual procompetitive justification and/or is broader than necessary to achieve any procompetitive benefits.

240.   As a direct, foreseeable, and proximate result of Shopify's violation

of §2 of the Sherman Act, Sezzle has suffered and continues to suffer harm to its business and property.

241.    Shopify's anticompetitive conduct described in this Complaint is precisely the kind of conduct that the antitrust laws seek to prevent.

242.    Sezzle is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

243.    Sezzle further seeks equitable relief in the form of an injunction preventing Shopify from continuing the unlawful conduct alleged in this Complaint and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Shopify is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the BNPL Markets, and to Sezzle and other competitors in those markets.

**Count III: Unlawful Tying**

**Sherman Act Section 1 (15 U.S.C. § 1)**

244.    Sezzle restates and realleges each and every allegation in this Complaint.

245.    Shopify has market power in the relevant market for Drag-and-Drop E-Commerce Platforms in the United States.

246.    The BNPL Market on the Shopify Platform and the relevant market

for Drag-and-Drop E-Commerce Platforms are separate and distinct markets, with separate and distinct products and features, and separate and distinct demand.

247. Shopify has unlawfully tied its Drag-and-Drop E-Commerce Platform to BNPL Services. Shopify has done so by policy, practice, and contract, as described earlier.

248. Shopify uses its market power in the Drag-and-Drop E-Commerce Platform market to compel merchants and end consumers to also use Shop Pay Installments, its offering in the BNPL Market on the Shopify Platform. It does this by rigging the checkout process to obfuscate or hide other BNPL services from consumers. Neither Sezzle, merchants, or end consumers are allowed to alter the checkout sequence. Thus, all or nearly all end consumers who wish to use BNPL Services on the websites of Shopify merchants are forced to use Shopify's Shop Pay Installments product, even if other products (such as Sezzle) are superior or preferred. It also engages in tying by financially penalizing merchants for using other BNPL services.

249. Shopify's tying conduct is exclusionary in relation to Sezzle and other competitors in the BNPL Market on the Shopify Platform. By preferencing itself and otherwise driving traffic and payment volume away from its BNPL competitors, Shopify precludes rivals from reaching scale, increases its rivals'

costs, increases its own market share, despite the fact that it has an inferior product to Sezzle, and weakens its and others' incentives to innovate.

250. Shopify's conduct affects a substantial amount of commerce in the BNPL Market on the Shopify Platform.

251. Shopify's anticompetitive conduct lacks any non-pretextual procompetitive justification and/or is broader than necessary to achieve any procompetitive benefits.

252. As a direct, foreseeable, and proximate result of Shopify's violation of § 1 of the Sherman Act, Sezzle has suffered and continues to suffer harm to its business and property.

253. Shopify's anticompetitive conduct described in this Complaint is precisely the kind of conduct that the antitrust laws seek to prevent.

254. Sezzle is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

255. Sezzle further seeks equitable relief in the form of an injunction preventing Shopify from continuing the unlawful conduct alleged in this Complaint and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Shopify is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the BNPL

Markets, and to Sezzle and other competitors in those markets.

## Count IV: Unlawful Contracts in Restraint of Trade
## Sherman Act Section 1 (15 U.S.C. § 1)

256.    Sezzle restates and realleges each and every allegation in this Complaint.

257.    Shopify has market power in the Relevant Markets for Drag-and-Drop E-Commerce Platforms and BNPL Services on the Shopify Platform.

258.    Shopify has entered into and enforced and continues to enter into and enforce contracts in restraint of trade. These include contracts with merchants that require those merchants to pay penalties on non-Shopify transactions and inhibiting them from installing Sezzle as a payment method on equal terms with Shop Pay Installments.

259.    These exclusionary contracts harm competition by, among other things, depriving consumers of choice for BNPL Services and causing merchants to pay supra-competitive and exclusionary penalties on non-Shopify payment platforms.

260.    Shopify's anticompetitive conduct lacks any non-pretextual procompetitive justification and/or is broader than necessary to achieve any procompetitive benefits.

261.    As a direct, foreseeable, and proximate result of Shopify's violation

of § 1 of the Sherman Act, Sezzle has suffered and continues to suffer harm to its business and property.

262.    Shopify's anticompetitive conduct described in this Complaint is precisely the kind of conduct that the antitrust laws seek to prevent.

263.    Sezzle is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Section 4 of the Clayton Act, 15 U.S.C. § 15.

264.    Sezzle further seeks equitable relief in the form of an injunction preventing Shopify from continuing the unlawful conduct alleged in this Complaint and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Shopify is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the BNPL Markets, and to Sezzle and other competitors in those markets.

## Count V: Violation of Minnesota Antitrust Law

### Minnesota Antitrust Law of 1971 (Minn. Stat. § 325D.49-325D.66)

265.    Sezzle restates and realleges each and every allegation in this Complaint.

266.    Shopify has willfully and intentionally obtained and/or maintained its monopoly in the BNPL Market on the Shopify Platform by engaging in the exclusionary and anticompetitive conduct set forth in this Complaint. This

conduct includes, at least, imposing penalties on merchants that choose to process transactions on the Sezzle platform, self-preferencing the checkout process, preventing Sezzle from offering real-time inventory locking and access to Order IDs on the Shopify platform, and downgrading the consumer experience with Sezzle.

267.    The direct, foreseeable, and proximate result of Shopify's anticompetitive conduct has been to reduce quality, increase prices, and otherwise harm competition in the BNPL Market on the Shopify Platform.

268.    Shopify's anticompetitive conduct lacks any non-pretextual procompetitive justification and/or is broader than necessary to achieve any procompetitive benefits.

269.    During the course of this anticompetitive conduct, Shopify had monopoly power in the BNPL Market on the Shopify Platform or, alternatively, has had a dangerous probability of succeeding in gaining a monopoly in and controlling the BNPL Market on the Shopify Platform.

270.    As a direct, foreseeable, and proximate result of Shopify's violation Section 352D.52 of the Minnesota Antitrust Law, Sezzle has suffered and continues to suffer harm to its business and property.

271.    Shopify has engaged in unlawful tying in violation of Minnesota Statutes Section 325.51 by using its market power in the Drag-and-Drop E-

Commerce Platform market to compel merchants and end consumers to also use Shop Pay Installments by rigging the checkout process to obfuscate or hide Sezzle from consumers and financially penalizing merchants for using other BNPL services. Shopify's conduct affects a substantial amount of commerce in the BNPL Market on the Shopify Platform.

272.    Shopify has engaged in unlawful restraints of trade in violation of Minnesota Statutes Section 325.51 by entering into contracts with merchants that require those merchants to pay penalties on non-Shopify transactions and inhibiting them from installing Sezzle as a payment method on equal terms with Shop Pay Installments.,

273.    Shopify's anticompetitive conduct described in this Complaint is precisely the kind of conduct that the antitrust laws seek to prevent.

274.    Sezzle is entitled to threefold or trebled damages, as well as costs, expenses, attorneys' fees, and interest under Minnesota Statutes Section 325D.57, and is entitled to an injunction preventing Shopify from continuing the unlawful conduct alleged in this Complaint and from employing any similar anticompetitive strategies that have similar purposes and effects under Minnesota Statutes Section 325D.58.

275.    Unless Shopify is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the BNPL Market on the Shopify

Platform, and to Sezzle and other competitors in those markets.

## Count VI: Unfair Competition Under Minnesota Law

## Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.44, Subd. 1(13))

276.    Sezzle restates and realleges each and every allegation in this

Complaint.

277.    As amended, effective August 1, 2023, the Minnesota Deceptive

Trade Practices Act prohibits "unfair methods of competition" and "unfair or

unconscionable acts or practices."[32] An "unfair method of competition or an

unfair or unconscionable act or practice is any method of competition, act, or

practice that: (1) offends public policy as established by the statutes, rules, or

common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is

substantially injurious to consumers."[33]

278.    Shopify has engaged in unfair methods of competition and unfair or

unconscionable acts or practices, prohibited by the Minnesota Deceptive Trade

Practices Act, Minn. Stat. § 325D.44, Subd. 1(13), by engaging in the exclusionary

and anticompetitive conduct set forth in this Complaint. This conduct includes,

at least, imposing penalties on merchants that choose to process transactions on

the Sezzle platform, self-preferencing the checkout process, preventing Sezzle

---

[32] Minn. Stat. § 325D.44, Subd. 1(13); 2023 Minn. Laws ch. 57, art. 4 § 6.

[33] Minn. Stat. § 325F.69, Subd. 8; *see also* Minn. Stat. § 325D.44, Subd. 2(b).

from offering real-time inventory locking and access to Order IDs on the Shopify platform, and downgrading the consumer experience with Sezzle.

279.    Shopify's conduct offends public policy as established the Sherman Antitrust Act and the Minnesota Antitrust Law of 1971, Minn. Stat. 325D.51 *et seq.*

280.    Shopify's conduct is unethical, oppressive, and unscrupulous, particularly given how Shopify has sought to take advantage of the anticompetitive barriers that it created to insulate Shop Pay Installments from competition on the merits.

281.    Shopify's conduct is also substantially injurious to consumers by impairing the choices available to consumers, including Sezzle's higher-quality BNPL service.

282.    Sezzle seeks equitable relief in the form of an injunction preventing Shopify from continuing the unlawful conduct alleged in this Complaint and from employing any similar anticompetitive strategies that have similar purposes and effects. Unless Shopify is enjoined, its unlawful and anticompetitive conduct will continue to cause harm to competition in the BNPL Markets, and to Sezzle and other competitors in those markets.

## Demand for Jury Trial

Sezzle demands a trial by jury on all triable issues.

## Prayer for Relief

WHEREFORE, Sezzle respectfully requests that this Court:

A.       Adjudge that Shopify violated federal antitrust laws, as set forth above;

B.       Adjudge that Shopify violated state antitrust and trade regulation laws, as set forth above;

C.       Enter judgment in favor of Sezzle and against Shopify and award Sezzle actual, treble, punitive, and/or exemplary damages; its attorneys' fees and costs; and pre- and post-judgment interest;

D.       Enter judgment in favor of Sezzle and against Shopify and permanently enjoin and restrain Shopify and its affiliates, successors or assignees, from in any manner continuing, maintaining or renewing its anticompetitive conduct and from adopting or following any practice, plan, or program having a similar purpose or effect;

E.       Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  June 9, 2025                        ROBINS KAPLAN LLP

By: _/s/ Michael A. Collyard_____
    Michael A. Collyard (#302569)
    Munir R. Meghjee (#0301437)
    Stephen P. Safranski (#0331326)
    Ryan W. Marth (#0327621)
    Peter C. Ihrig (#0390392)
    Maxwell E. Loos (#0504841)
    800 LaSalle Avenue, Suite 2800
    Minneapolis, MN 55402
    Telephone: 612.349.8500
    Facsimile: 612.339.4181
    *mcollyard@robinskaplan.com*
    *mmeghjee@RobinsKaplan.com*
    *ssafranski@robinskaplan.com*
    *rmarth@robinskaplan.com*
    *pihrig@robinskaplan.com*
    *mloos@robinskaplan.com*

    ***Attorneys for Plaintiff Sezzle, Inc.***